IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| MICHELLE ANTOLIK, SARA BIRIS, MARLEEN DIXON, ANNE GOLKE, CAROL JONES, JENNIFER LADEHOFF, SUSAN MCCLELLAN, DARLENE OWENS, LINH PHANTHAVONG, SUSAN ROBEOLTMAN, DENA Steinback, JULIE VOGELER, CONNIE WARD, TOSHA WHITSON, CHERYL WOMACK, on behalf of themselves and all others similarly situated, | * * * * * * * * * * * * | 4:03-cv-90203 |
| Plaintiffs, | * * | |
| v. | * * | |
| SAKS INCORPORATED, d/b/a Younkers, | * * * | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON BENCH TRIAL |
| Defendant. | * * | |

I. JURISDICTION

A bench trial was held in the above-captioned case August 30, 2005, through August 31,

2005. Class Plaintiffs are seeking to recover benefits under an ERISA plan pursuant to 29 U.S.C §

1132(a)(1)(B). Federal subject matter jurisdiction is proper under 28 U.S.C. § 1331 and personal

jurisdiction and venue are proper in the Southern District of Iowa. A previous order of this Court

(Clerk's No. 68) held that the October 27, 2000 letter that Defendant distributed to introduce and

explain the 2000 Change of Control and Material Transactions Severance Plan ("Change of Control

Plan"), is a faulty Summary Plan Description ("SPD"). The issues to be decided at trial, accordingly

were whether the terms of the undisclosed formal plan document and the faulty SPD conflict and

whether the Class Plaintiffs relied upon or were prejudiced by the faulty SPD.

## II.  FINDINGS OF FACT

Federal Rule of Civil Procedure 52(a) requires that in all cases tried without a jury or with an advisory jury, "the court shall find the facts specially and state separately its conclusions of law thereon."  In determining the credibility of the witnesses and the weight to be accorded their testimony, the Court has taken into consideration:

> the character of the witness[es], [their] demeanor on the stand, [their] interest, if any, in the result of the trial, [their] relation to or feeling toward the parties to the trial, the probability or improbability of [their] statements as well as all the other facts and circumstances given in evidence.

*Clark v. United States*, 391 F.2d 57, 60 (8th Cir. 1968).

Accordingly, the Court makes the following findings of fact:

1.   Saks, Inc. ("Saks") is a corporation which owns and operates retail department stores through its various subsidiaries and affiliates.  In the year 2000, Saks Inc. stores operated using the names Younkers, Herberger's, Carson Pirie Scott, Boston Store, Saks Fifth Avenue, Proffitt's and McRae's.

2.   In the year 2000, Saks Inc. had a number of unincorporated major business units, also known as divisions, of which Younker's was one.

3.   Plaintiff Class is defined as:

> All salaried employees in the Younkers division of Saks, Inc., in Des Moines, Iowa, who received the October 27, 2000 letter and to the extent different, those to whom Saks Inc. communicated the existence of the 2000 Change of Control Severance Plan for which the consolidation of the Younkers division headquarters into Saks' Carson Pirie Scott division on or about January 30, 2003 caused the elimination of their position, a reduction in their pay, or a change in their employment location greater than 50 miles.

4. The Class Representatives include: Michelle Antolik, Sara Biris, Marleen Dixon, Anne Golke, Carol Jones, Jennifer Ladehoff, Susan McClellan, Darlene Owens, Linh Phanthavong, Susan Robeoltman, Dena Steinback, Julie Vogeler, Connie Ward, Tosha Whitson and Cheryl Womack.

5. The following individuals were buyers for Younkers on the date when it was announced that Younkers would be consolidated with Herberger's, but they were not buyers on October 27, 2000: Randall Prebeck; Rebecca Anderson; Jennifer Frink; Sarah Hintze; Eric McLaughlin; Mindy Norblade; Peggy Stoll-Koch; Jennifer Woodman; Jean Cushman. Ex. 5B.

6. The individuals listed in Exhibit 5B, were eligible for the for the ERISA benefits, and may have received the October 27, 2000 letter. Ex. 5B; Trial Tr. vol. 2, 354-5 (Barkley test.).

7. Before October 2000, there was a consolidation of Herberger's division headquarters into the Carson Pirie Scott division headquarters.

8. Before October 2000, there was a consolidation of the McRae's home office into Proffitt's.

9. Prior to the distribution of the October 27, 2000 letter, rumors were circulating among Younkers employees, including the representatives of the Plaintiff Class, about the possibility that Younkers could be consolidated with another division of Saks or bought out by another company. Golke Dep. 7-8; Trial Tr. vol. 1, 59 (McClellan test.); Trial Tr. vol. 1, 71 (Ladehoff test.); Trial Tr. vol. 1, 95 (Biris test.); Trial Tr. vol. 1, 102 (Phanthavong test.); Trial Tr. vol. 1, 110 (Steinback test.); Trial Tr. vol. 1, 123 (Whitson test.); Trial Tr. vol. 1, 131 (Barber test.); Trial Tr. vol. 2, 159 (Owens test.); Trial Tr. vol. 2, 170 (Dixon test.); Trial Tr. vol. 2, 181 (Womack test.); Trial Tr. vol. 2, 188 (Hamilton test.); Ward Dep. 15; Trial Tr. vol. 2, 259 (Sones test.); Trial Tr. vol. 2, 302 (Coan test.); Trial Tr. vol. 2, 328, 348 (Barkley test.); Toth Dep. 8.

10. Prior to the meeting on October 27, 2000, there was a period of unrest, low productivity, and people were leaving the company. Trial Tr. vol. 1, 123 (Whitson test.); Trial Tr. vol. 2, 328, 338 (Barkley test.).

11. The purpose of the ERISA plan as stated in the October 27, 2000 letter was stated as: "The Board wants each key associate's full attention on achieving our plans and building a great enterprise. To support this goal and diffuse further concerns, the Board has provided a plan that functions as an associate insurance policy, protecting against an unlikely but worrisome event." Ex. B. The benefit to Saks was a return to productivity. Trial Tr. vol. 2, 303-4 (Coan test.).

12. On July 20, 2000, Saks issued a press release announcing that the Board of Directors had

approved plans for a strategic restructuring in which Saks would "spin-off" Saks Fifth Avenue, Saks Direct, and Saks Off Fifth operations into a separate, publicly owned company.  On September 6, 2000, a second press release was issued which set forth the timetable for the completion of the spin-off.  Exs. CC, DD, EE.

13.   In 2000, there were no plans to sell Saks Inc. or any of its divisions.  However, had a  spin-off taken place, some of the divisions might have been more vulnerable to a takeover by an outside company.  Trial Tr. vol. 2, 275-290 (Martin test.).

14.   Some Class Plaintiffs heard rumors that Saks, Inc. was for sale, but others did not know of the press release.

15.   The Herberger's consolidation was particularly unsettling for Class Plaintiffs, unlike prior consolidations, because it created a northern division and a southern division, leaving Younkers as the smallest independent division.  Golke Dep. 7; Trial Tr. vol. 1, 59 (McClellan test.); Trial Tr. vol. 1, 71 (Ladehoff test.); Trial Tr. vol. 1, 107 (Phanthavong test.); Trial Tr. vol. 2, 190 (Hamilton test.).

16.   In the past, when other consolidations occurred at Saks Inc., the Officers and Board of Directors had consistently paid severance upon such events.  Trial Tr. vol. 2, 263 (Martin test.).

17.   On September 13, 2000, approximately two years prior to the announcement of the Younkers Consolidation, the Board of Directors of Saks Inc. adopted a Change of Control and Material Transaction Severance Plan.  The ERISA Plan was communicated to salaried employees of Saks Incorporated above the merchandise buyer level on or about October 27, 2000.  Exs. A, B.

18.   All of the Plaintiffs' Class Representatives were buyer-level and above employees of Saks Inc. and all worked at the Younkers division in Des Moines, Iowa.

19.   All Class Plaintiffs were buyer-level and above employees of Saks Inc. working at Younkers division in Des Moines, Iowa at the time the consolidation was announced.

20.   All of the Plaintiffs' Class Representatives received the October 27, 2000 letter.

21.   All Class Plaintiffs who were buyer level or above employees of Saks, Inc. on October 27, 2000, received the October 27, 2000 letter.

22.   All of the Plaintiffs' Class Representatives attended the October 27, 2000 meeting, except Susan Robeoltman.

23.     All of the Class Plaintiffs, except for Terry Montgomery, Randall Prebeck, Rebecca Anderson, Jennifer Frink, Sarah Hintze, Eric McLaughlin, Mindy Norblade, Peggy Stoll-Koch, Jennifer Woodman, Jean Cushman, and Susan Robeoltman attended the October 27, 2000 meeting. Ex. 5B; Trial Tr. vol. 1, 27 (Montgomery test.).

24.     Susan Robeoltman did not attend the meeting on October 27, 2000, but she received the October 27, 2000 letter from Mark Leslie the next day when she returned to work.  Trial Tr. vol. 1, 83 (Robeoltman test.).

25.     All of the Plaintiffs' Class Representatives lost their job as a result of the consolidation or would have had to relocate over fifty miles away.

26.     All of the Class Plaintiffs lost their job as a result of the consolidation or would have had to relocate over fifty miles away.

27.     None of the Plaintiffs' Class Representatives received the ERISA Plan document entitled "2000 Change of Control and Material Transaction Severance Plan."

28.     None of the Class Plaintiffs received the ERISA Plan document entitled "2000 Change of Control and Material Transaction Severance Plan," except for Mark Barkley.

29.     The Change of Control Plan contains provisions regarding the eligibility of employees for benefits, the amount of benefits, the criteria for benefits, and the procedure for claiming benefits.

30.     The Change of Control Plan further provides that a participant in the Plan is entitled to severance pay if, inter alia, the change of control causes the elimination of the participant's position, a reduction in the participant's pay, or a change in the participant's location greater than 50 miles.

31.     On January 30, 2003, due to the consolidation of the Younkers division into the Carson Pirie Scott division, the members of the Plaintiff Class experienced elimination of their position, or a reduction in their pay, or a change of their location greater than 50 miles.

32.     It was the intent of Saks Inc. not to provide the Class Plaintiffs with Exhibit 12, the September 2000 Undisclosed Plan document entitled "2000 Change of Control and Material Transaction Severance Plan."

33.     Saks never advised the Class Plaintiffs that they had administrative remedies.

34.     At the meeting held on October 27, 2000, the words of the October 27, 2000 letter were read verbatim to the attendees to introduce the Change of Control Plan.  Trial Tr., vol. 2, 342

(Barkley test.).

35.     There was nothing said or distributed at the October 27, 2000 meeting, or at any time up to the announcement of consolidation, to modify the plain meaning of the words "change of control" as defined in the letter.

36.     All Class Members testified that they left the meeting on October 27, 2000 with the understanding that a change in control included an internal consolidation as had recently happened at Herberger's and as eventually occurred at Younkers in October, 2002.

37.     After the October 27, 2000 letter was distributed at the October 27, 2000 meeting, the Younkers division's productivity substantially increased.  Trial Tr. vol. 1, 42 (Montgomery test.); Kulp Dep. 49; Trial Tr. vol. 2, 328 (Barkley test.).

38.     From October 27, 2000 to October 1, 2002, Class Plaintiffs forewent other employment opportunities, ignored calls from headhunters, and did not actively seek alternative employment.

39.     On October 1, 2002, Saks announced its decision to consolidate its Younker's division headquarters in Des Moines, Iowa, into its Carson Pirie Scott division in Milwaukee, Wisconsin.  The consolidation did not involve an unaffiliated third party.  The Younkers Consolidation was completed in the Spring of 2003.

40.     Over a dozen of the Class Plaintiffs inquired about the change of control plan immediately after the consolidation was announced.  Trial Tr. vol. 1, 50 (Montgomery test.); Golke Dep. 15-6; Trial Tr. vol. 1, 75 (Ladehoff test.); Trial Tr. vol. 2, 236 (Severson test.); Trial Tr. vol. 2, 352 (Barkley test.); Toth Dep. 21.

41.     Some class plaintiffs did not remember the existence of the change of control plan until they were approached regarding this litigation.  Trial Tr. vol. 1, 90 (Robeoltman test.); Trial Tr. vol. 1, 105  (Phanthavong test.); Trial Tr. vol. 1, 136 (Barber test.).

42.     All of the Plaintiffs' Class Representatives received separation pay in the form of a discretionary payment rather than under the Change of Control Plan.

43.     All of the Class Plaintiffs received separation pay in the form of a discretionary payment rather than under the Change of Control Plan.

44.     Class Plaintiffs also received a Cooperation Bonus, which was awarded according to the following criteria:

Each area that has executives on the cooperation bonus incentive plan will define specific objectives they need their executives to achieve to qualify for the bonus. These objectives will be tied to transition duties and running the 4th quarter business in a manner that maintains the integrity of the long-term business objectives. These objectives must be met on or before the executive's separation date in order for the executive to earn the cooperation bonus. The appropriate Carson's executive committee member will make the determination as to whether the objectives have been met. The cooperation bonus will be an all or none payment, so if any of the objectives that have been set are not achieved the executive will not receive the cooperation bonus at separation. The executive must also work through her separation date to receive payment of the cooperation bonus and severance. Personalized documents will be given to each affected associates with the details of cooperation bonus payment and severance.

Ex. G.

45.    Class Plaintiffs ignored phone calls received from headhunters, and following the announcement of the consolidation, it was more difficult for Class Plaintiffs to find alternative employment because of the flooded job market. Trial Tr. vol. 1, 38 (Montgomery test.); Golke Dep. 20; Trial Tr. vol. 1, 62 (McClellan test.); Trial Tr. vol. 1, 74, 79 (Ladehoff test.); Trial Tr. vol. 1, 133 (Barber test.); Trial Tr. vol. 1, 143 (Jones test.); Trial Tr. vol. 2, 162 (Owens test.); Trial Tr. vol. 2, 173 (Dixon test.); Trial Tr. vol. 2, 192 (Hamilton test.); Toth Dep. 13.

## III.  DISCUSSION

### A.  *The Meaning of Change of Control*

Before the Court are two plan documents comprising Saks Inc.'s 2000 Material Change of Control and Material Transactions Severance Plan – the formal plan document and the faulty SPD. The parties agree that the formal plan definition of "change of control" does not include payment of severance benefits upon the occurrence of an internal consolidation, such as the consolidation of Younkers into Carson Pirie Scott. This fact alone, however, does not bar Class Plaintiffs' recovery because of the presence of the SPD. The only information Plaintiffs were given in regards to the Plan was found in the language of the SPD. "Because of the importance of disclosure to the statutory

regime, an SPD provision prevails if it conflicts with a provision of a plan." *Jensen v. SIPCO, Inc*., 38 F.3d 945, 952 (8th Cir. 1994) (citing *Aiken v. Policy Mgmt. Sys. Corp*., 13 F.3d 138, 140-41 (4th Cir. 1993)); see also *Chiles v. Ceridian Corp*., 95 F.3d 1505, 1515 (11th Cir. 1996) ("Because the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself."). There are, however, limits to this rule of construction. "Specifically, 'this rule of construction does not apply when the plan document is specific and the SPD is silent on a particular matter.'" *Koons v. Aventis Pharms. Inc.*, 367 F.3d 768, 775 (8th Cir. 2004) (quoting *Jensen,* 38 F.3d at 952). For the SPD terms to control, there must be a direct conflict between the SPD and the formal plan.

Defendant argues that the SPD crafted by Saks Inc. is silent on the issue of what is meant by "change of control," and therefore, there is no conflict between the SPD and the formal plan. The Court cannot agree. In *Jensen*, the Eighth Circuit found an SPD to be silent, but in that case the SPD completely omitted a reservation of rights clause, making the SPD truly silent on the subject. *Jensen,* 38 F.3d at 952. In contrast, in the present case, the words "change of control" are used three times in the faulty SPD. The term is used once in the introductory paragraph: "The Board of Directors of Saks Incorporated has adopted a change of control severance plan for certain salaried associates," and once in the second paragraph, which explains the purpose of the plan: "The Company (including the individual divisions that comprise it) is not for sale and we do not anticipate any circumstances leading to a change of control." Additionally, the third paragraph of the faulty SPD states: "For you personally, were there to be a change of control or a sale of a major business unit that caused the elimination of your position, a reduction in your pay, or a change of your location greater than 50 miles,

you would be entitled to 26 weeks of salary." The simple fact that Defendant failed to include a separate qualifying definition of "change of control" does not render the SPD silent on the subject. *See Marolt v. Alliant Techsystems,* 146 F.3d 617, 621 (8th Cir. 1998) ("Although the SPD does not mention the transferred employee restriction, we reject Alliant's view that the SPD is silent on the "particular matter" at issue here, which is bridging. On that subject, the SPD recites a number of criteria that clearly and unambiguously entitle Marolt to bridge her break in service. Those are binding.") (internal citations omitted). The lack of a qualifying definition of the words "change of control," rather than rendering the SPD silent, simply means that the plain definition of the words control rather than specialized legal jargon.[1]

An SPD "shall be written in a manner calculated to be understood by the average plan participant." *Palmisano v. Allina Health Sys.*, 190 F.3d 881, 888 (8th Cir. 1999). The terms "should be accorded their ordinary, and not specialized, meanings." *Brewer v. Lincoln Nat'l Life Ins.*, 921 F.2d 150, 154 (8th Cir. 1990). "An employee should not be required to adopt the skills of a lawyer" in order to comprehend the language in his or her own ERISA plan. *Barker v. Ceridian Corp.*, 122 F.3d 628, 634 (8th Cir. 1997). The interpretation of terms in an ERISA plan is done by "'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words.'" *Hughes v. 3M*

---

[1] "Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask." *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991)

*Retiree Med. Plan,* 281 F.3d 786, 7890790 (8th Cir. 2002) (citing *Chiles*, 95 F.3d at 1511).  The

Court must, therefore, in interpreting the SPD, give its terms their "common and ordinary meaning," or

in the words of Brad Martin, Chairman and CEO of Saks Inc.:  "I signed the letter and it means what it

says on its face."  Trial Tr., vol. 2, 279.

Focusing on the text of the SPD itself, there is nothing contained within which makes the phrase

"change of control" ambiguous — i.e., to indicate that the ordinary meaning should not be applied.

"The determination of whether a term is ambiguous is a question of law*." Taylor v. Cont'l Group

Change of Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3rd Cir. 1991) (citing *Mellon Bank,

N.A. v. Aetna Bus. Credit, Inc*., 619 F.2d 1001, 1011 (3rd Cir. 1980)).  While Defendant states that

the term is ambiguous, an ambiguity only exists if "it is subject to reasonable alternative interpretations."

*Taylor*, 933 F.2d at 1232; *see also Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999)

("A contract is not ambiguous merely because the parties disagree over its meaning.").  Defendant

points to nothing in the text of the SPD itself to persuade this Court to apply anything but the "ordinary,

not specialized, meaning[]" of the words in the SPD.  For example, in *Taylor*, the defendant

demonstrated ambiguity in the word "successor" as used in the ERISA plan document by showing that

"interpreting the term 'successor' to include purchaser of a division would render another provision in

the document ineffectual."  *Taylor*, 933 F.2d at 1235.  Additionally, the Eighth Circuit, in *Melvin v.

Yale Indus. Prods. Inc*., 197 F.3d 944 (8th Cir. 1999), held that the term "non-occupational" as used

in an ERISA plan was not ambiguous as applied to the facts of the particular case, noting that "we must

construe the disputed language 'without deferring to either party's interpretation' unless the plan

language specifies otherwise."  *Melvin,* 197 F.3d at 948 (quoting *Wallace v. Firestone Tire &*

*Rubber Co.*, 882 F.2d 1327, 1329 (8th Cir. 1989) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989)).  The SPD created by Saks Inc. does not set off the words "change in control" by italics or quotations, nor does the SPD include any language to put the employees on notice that anything but the common, ordinary, general definition controls.  Accordingly, the Court finds that the words "change of control," as used in the SPD, are not ambiguous.

The dictionary definition of the word control is: "[T]he act or fact of controlling:  power or authority to guide or manage: directing or restraining domination."  Webster's New Int'l Dictionary 496 (1961).  The SPD specifically states:  "For you personally, were there to be a change of control or sale of a major business unit . . . ."  Younkers was a major business unit that is now under the control, management, and guidance of Carson Pirie Scott.  When that consolidation took effect, it personally affected the employees of Younkers, and Younkers ceased to be in control.  The formal plan document definition of "change of control" does not clarify the meaning of change in control, but completely excludes and limits the ordinary meaning of the words change of control.  *See Hendricks v. Central Reserve Life Ins.* 39 F.3d 507, 512 (4th Cir. 1994) ("If we were to find that the generally accepted definitions of "experimental" and "investigative" as used in the summary plan description differed substantially from the definitions of the terms given in the official plan document, the resulting conflict might require us to apply our *Aiken* line of cases.")[2].  Since the plain reading of the letter is not ambiguous and the common understanding of the words "change of control" includes an internal

---

[2]  The Fourth Circuit case of *Aiken* reversed an order of summary judgment in favor of the employer, for further development of the issues of reliance and prejudice.

consolidation, the two plan documents are in direct conflict.[3]  In such a conflict, the meaning of the

words, as used in the SPD, controls.  Since the SPD is faulty, however, in order to recover the benefits

promised within the SPD, the Plaintiffs must show that they relied upon or were prejudiced by the faulty

SPD.[4]

## B. *Reliance or Prejudice Standard*

Since the SPD does conflict with the other plan document, the Class Plaintiffs must "show that

[they] relied on or [were] prejudiced by the SPD's description of the plan benefits." *Koons v. Aventis*

*Pharms. Inc.*, 367 F.3d 768 (8th Cir. 2004) (citing *Dodson v. Woodmen of the World Life Ins.*

*Soc'y*, 109 F.3d 436, 439 (8th Cir. 1997)).  In 1984, the Eighth Circuit, in *Monson v. Century Mfg.*

*Co.,* 739 F.2d 1293 (8th Cir. 1984), discussed the standard for detrimental reliance:  "Logically,

evidence of detrimental reliance must show that the plaintiffs took action, resulting in some detriment,

that they would not have taken had they known that they were getting only one-third of corporate

profits." *Monson*, 739 F.2d at 1302.  In *Monson*, reliance could be inferred as a matter of law

because of "defendants' countless representations that the profit-sharing program provided a strong

incentive for the employees to do extra work and to stay with the company." *Id*.  The defendants in

---

[3] There are additional conflicts between the SPD and formal plan.  The SPD defines change of control as something different than a sale.  However, the formal plan indicates that some changes of control are sales, not that they are mutually exclusive terms.

[4] Defendant correctly states that this Court found the October 27, 2000 letter to be a faulty SPD because it was missing "the circumstances which may result in denial or loss of benefits and the claims procedures and remedies available for redress of denied claims."  Clerk's No. 68 at 12.  The previous Order did not hold, however, that there was no conflict between any of the SPD terms and formal plan terms.

that case argued that "each person must be able to spell out exactly what job opportunities he gave up

or what extra work he did on account of the misrepresentation," but the Eighth Circuit held that "such

direct evidence [was] unnecessary." *Id.*  Further, the *Monson* Court found that, even without such

testimony, "ample evidence" supported the district court's finding of detrimental reliance.  *Id.*

In *Lee v. Union Elec. Co.,* 789 F.2d 1303 (8th Cir. 1986), *cert. denied*, 479 U.S. 962

(1986), the Eighth Circuit adopted the reliance or prejudice standard in regards to securing relief based

on a faulty SPD.  The plaintiff in that case lost because the "summary plan description adequately

explained the need for an election." *Lee*, 789 F.2d at 1308.  The *Lee* Court, however, went on to

state that even if the SPD had been inadequate, "the absence of any indication that Mr. Lee expressed

any interest in the Survivor Benefit Option, despite the repeated opportunities to do so, would pose a

significant barrier to recovery." *Id*.  The *Lee* Court then stated:  "To secure relief on the basis of a

faulty summary plan description, the claimant must show some significant reliance on, or possible

prejudice flowing from the summary." *Id.* (citing *Govoni v. Bricklayers*, 732 F.2d 250, 252 (1st Cir.

1984); *Hillis v. Waukesha Title Co., Inc*., 576 F. Supp. 1103, 1109-10 (E.D. Wis. 1983)).

Evidence outside of the terms of the SPD, in the form of repeated letters sent to Lee describing the

election, to which he did not respond, negated the possibility that he relied on the words of the

summary plan description itself, or if he did, it was unreasonable reliance.

The Eighth Circuit applied the reliance or prejudice standard again in *Anderson v. Alpha

Portland Indus., Inc.,* 836 F.2d 1512 (8th Cir. 1988).  In that case, the plaintiffs argued that

detrimental reliance could be inferred, as it was in the *Monson* decision.  *See Anderson,* 836 F.2d at

1520 (declining to infer reliance because plaintiffs did not provide any evidence "from which reliance

may be inferred."). Detrimental reliance could also not be inferred in *Maxa v. John Alden Life Ins.*

*Co., 972 F.2d 980 (8th Cir. 1992).* In that case, an inference was not proper because there was no

evidence that "the plan description caused the estate's decedent not to apply for Medicare." *Maxa*,

972 F.2d at 984. The facts of *Maxa* were distinguished from the facts of *Monson* in that, "the plan

description provided by the certificate of group insurance . . . enabled a reasonable participant to

conclude that he or she might have to enroll in Medicare in order to avoid a reduction of overall

benefits, and at the very least did not suggest to a reasonable reader that there was no need to apply for

Medicare." *Id.* at 984-85. Accordingly, the plaintiff needed to supply direct evidence that "plaintiff

took action, resulting in some detriment, that [he] would not have taken had [he] known [that the terms

of the plan were otherwise], or that he failed to his detriment, to take action that he would have taken

had he known that the terms of the plans were otherwise." *Id.* Since the plaintiff "neither provided nor

proffered below, or for that matter even in this Court any direct evidence that Maxa failed to enroll in

Medicare because of the language of the plan summary," plaintiff was precluded from recovery. It is

important to note that, in *Maxa*, the beneficiary of the plan in question was deceased and, therefore,

was unable to provide any direct testimony regarding his reliance. Moreover, the Eighth Circuit noted

that "the reduction of Neil Maxa's premiums from 210 to 134 undercuts the estate's argument of

detrimental reliance because it should have been brought to the attention of a reasonable participant in

Neil Maxa's shoes the possibility that his benefits had been reduced." *Id.*

The reliance or prejudice standard was applied again by the Eighth Circuit in *Dodson.* 109

F.3d at 436. In that case, the plaintiff did show that he was "prejudiced by the omission of the time

limit for filing from the SPD." As in the present case, "the SPD was the only document describing the

group policy that Dodson had ever received." *Id.* at 439.  Dodson was prejudiced by the faulty SPD

because "[h]ad the SPD informed Dodson that the period for claiming benefits would expire in

September of 1991, he would have had the opportunity to timely file or otherwise preserve his

benefits." *Id.* The *Dodson* court also cited an Eleventh Circuit case, *Branch v. G. Bernd Co.,* 955

F.2d 1574, 1579 n.2 (11th Cir. 1992), which held that evidence showing that a beneficiary received

and read an SPD and failed to act based on the representations found in the SPD "would support

beneficiary's claim for relief based on a faulty summary."  The lost opportunity was enough to establish

reliance or prejudice on the SPD, and  "[a]bsent evidence showing that Dodson actually knew of the

time limit in the group policy, he should not be barred from coverage in the circumstances of this case."

*Id.*

   In 2004, the Eighth Circuit, again, applied the reliance or prejudice standard in *Koons*.  367

F.3d 768.  In that case, the SPD and the plan documents conflicted on whether an employee would

receive benefits if he or she was terminated for violating company policy.  A seven-page Plan

description stated that, if an employer were terminated for violating company policy, no benefits would

be received, whereas, the one-page SPD did not include that restriction.  Though Koons was

terminated for violating company policy, he could not establish that he relied on the faulty SPD because

he acknowledged in direct testimony that "he knew from the seven page Plan description . . . that if he

was terminated for violating company policy, he would not be entitled to severance benefits." *Koons,*

367 F.3d at 776.  In short, Koons could not rely on the language of the SPD, if he, for a fact, knew

that it was incorrect.  "The fact that he did not refrain from misconduct despite this knowledge, may

indicate he did not know his conduct violated company policy . . . but in no way establishes reliance or

prejudice from the faulty SPD." *Id.* It is with these precedents in mind, that the Court sets out to decipher whether Plaintiffs established reliance upon or prejudice resulting from the faulty SPD.

The present case is distinguishable from *Monson*, as there were not "countless representations" from the Defendant indicating that a change of control included an internal consolidation. In this case, there is only the SPD itself and the meeting at which it was presented that constitutes the entire communication regarding the ERISA plan. However, as discussed in the previous section, the plain meaning of the words "change of control" cover an internal consolidation as occurred at Younkers. Further, the discussion of the ERISA plan at the meeting held on October 27, 2000, consisted of Mark Barkley reading the faulty SPD to the Class Plaintiffs verbatim. Thus, there was no information provided to the Plaintiffs to negate their understanding, to which they consistently testified, that the ERISA Plan covered internal consolidations. This fact distinguishes the present case from the decisions in *Lee*, *Anderson*, *Maxa*, and *Koons*, where the facts showed that the plaintiffs in those cases knew that the information in the SPD was false, or that they never read the SPD in question, and therefore could not establish reliance. While in the present case, the Defendant's evidence showed that those in management knew of the specialized meaning of "change of control," the evidence also showed that Defendant never presented or provided anything to the employees to convey that alternate meaning.

The facts, established at trial, most closely resemble the situation that was before the *Dodson* Court, where the plaintiff showed that he was "prejudiced by the omission of the time limit for filing the SPD." First, like *Dodson*, the SPD in the present case was the only information available to the Plaintiffs, and it was upon the words of the SPD that reliance or prejudice was established. Second, the evidence in the present case established that all Class Plaintiffs received the SPD, had the SPD read

-16-

to them, and understood the SPD to cover internal consolidations.  The *Dodson* Court stated:  "Had the SPD informed Dodson that the period for claiming benefits would expire in September of 1991, he would have had the opportunity to timely file or otherwise preserve his benefits."  *Dodson*, 109 F.3d at 439.  In the present case the direct evidence presented by the Plaintiffs indicates that, had they known that the ERISA plan did not cover internal consolidations, they would have acted differently and not forewent opportunities that they otherwise would have considered.  The Court is persuaded by reasoning found in *Dodson* that "absent evidence showing that Dodson actually knew of the time limit in the group policy, he should not be barred from coverage in the circumstances of this case."  *Id.* Likewise, based on the circumstances of the present case, absent evidence that Plaintiffs actually knew that the ERISA plan did not cover internal consolidations, they should not be barred from recovering the promised severance pay.

Prior to the receipt of the SPD, there was a period of unrest at Younkers.  Within Saks Inc., there had occurred two internal consolidations:  Proffitt's into McRae's and Herberger's into Carson Pirie Scott.  Though there had been previous consolidations at Saks Inc., the Herberger's consolidation in particular caused the Class Plaintiffs increased concern because there was now a northern division and a southern division, leaving Younkers as the smallest independent division.  The Class Plaintiffs feared that Younkers was the next to be consolidated.  In the words of Class Plaintiff Suzanne McClellan:  "[W]ell, basically we knew we were the smallest division, and we knew it was not an if, it was a when, and we were concerned that two consolidations had happened right after each other, that this consolidation was not far behind."  Trial Tr. vol. 1, 59 (McClellan test.).  As a result of the unrest, some employees were leaving and the "numbers at Younkers were not that great, and the bonuses that

people would have been eligible for at the end of 2000 were at risk." Trial Tr. vol. 2, 328, 338

(Barkley test.). "The letter's [SPD's] purpose was to allow people to return their focus to doing their

job and doing the best work they are capable of doing." Trial Tr. vol. 2, 303 (Coan test.). The return

to Saks Inc. from the ERISA plan was intended to be "productivity, [a] return to productivity." *Id.* at

304.

The SPD was effective. The rumors ceased, Younker's numbers went up, not only for the

fourth quarter of 2000, but up until the announcement of the consolidation in 2002. Frank Kulp

testified as to his reaction when he heard of the consolidation in 2002: "I was mad because we ran a

good division. We had wonderful people. They were hard workers. They were outperforming their

counterparts in the other divisions . . . " Kulp Dep. 49:17-23. This increase in productivity is direct

evidence of the Plaintiffs' reliance. All of the Class Plaintiffs remained employed at Younkers, remained

focused on their jobs, and were better able to perform their jobs for Younkers. The evidence shows

direct links between the Herberger's consolidation, the period of unrest within the Younkers

workforce, the distribution of the SPD, and a return to productivity at Younkers. It is illogical to

conclude that the unrest among the Younkers workforce would have ceased without a cause, the cause

being the distribution of the SPD. Though Defendant's witnesses testified that, in the past, they

provided severance when divisions were consolidated, what Saks did in the past did not ensure to

Younkers employees that the same would occur in their situation. In contrast, the SPD provided

concrete assurance that they would be given a cushion of time in which to find other employment.

Additionally, all of the witnesses for the Class Plaintiffs testified that they would have acted

differently had the specialized "change of control" definition been provided to them. The Plaintiffs

testified that they ignored calls from headhunters and did not actively seek work due to the commitment

by Saks found in the SPD.  The SPD provided a strong incentive for the employees to stay with the

company and remain focused.  In short, they were lulled into a false sense of security by the information

provided in the SPD.  Because of this mistaken belief, they did not pursue other opportunities, were

prejudiced by being denied severance benefits, and were released into a flooded job market for

merchandise buyers in Des Moines, making it more difficult to find alternate employment when the

consolidation was announced.  The SPD induced the Plaintiffs not to act, so that they "failed to their

detriment, to take action that they would have taken had they known that the terms of the plan were

otherwise."  *Maxa,* 972 F.2d at 984.  The letter told them to not worry, and the plaintiffs responded

accordingly.  In this case, direct evidence of specific jobs that were passed up is not necessary.  In fact,

presenting such evidence would create an almost insurmountable burden since the SPD called for

Plaintiffs to stay loyal to Younkers.  Further, even though some Class Plaintiffs testified that they were

not actively looking for employment at the time the SPD was distributed, the evidence did show that

unrest among employees existed, employees were leaving, and that between October 27, 2000 and the

announcement of the consolidation, the Class Plaintiffs would have looked for alternative employment.

Class Plaintiff, Michelle Barber (f/k/a Michelle Antolik) testified that:  "It had been only three months

since they closed Herberger's.  It was a small roar by the time we got the letter."  Trial Tr. vol. 1, 135.

What would have happened over two years of unrest is merely speculative, but due to the distribution

of the letter and reliance by the employees, Saks never had to feel the effects of that roar.

Once the consolidation of Younkers into Carson Pirie Scott was announced, there were several

Class Plaintiffs that inquired about the severance payments.  They were summarily told that the ERISA

severance payments were not applicable because it was an internal consolidation.  Defendant's position

regarding the SPD was spread around the workforce.  Further, the exit interviews where the Class

Plaintiffs were told of their severance payments were held the same day the consolidation was

announced.  The fact that some Class Plaintiffs did not remember the SPD, until they were contacted

by other members of the Class, does not preclude a finding of reliance.  Some class members testified

that they did not push the issue of the SPD because they were looking to interview at other divisions at

Saks Inc. and did not want to jeopardize the severance package that they were receiving.  The facts

do, however, show that at the time the SPD was distributed, all Class Plaintiffs read and understood the

SPD to provide significant severance if there were an internal consolidation.  The Class Plaintiffs

remained employed at Younkers and increased their productivity.  When the consolidation was

announced they were prejudiced by being thrown into a tight job market with less of a cushion than

they expected.  Defendant failed to show evidence that the Class Plaintiffs did have knowledge of the

specialized definition of "change of control," or that the misinformation was harmless error.[5]  *See Burke*

*v. Kodak Ret. Income Plan,* 336 F.3d 103,114 (2d Cir. 2003), *cert denied*, 157 L.Ed. 2d 890

(2004) (discussing what evidence a defendant must introduce to preclude a finding by a court that the

---

[5]  In a recent casenote in the Iowa Law Review, the author discusses the split between the Circuit courts in regards to what proof is necessary for recovery based on a faulty SPD, which ranges from a strict showing of detrimental reliance to no showing of reliance being necessary.  *See Branch v. G. Bernd Co.,* 955 F.2d 1574 (11th Cir. 1992) (applying the detrimental reliance standard); *Burstein v. Ret. Account Plan for Employees of Allgheny Health Educ. & Research Found.,* 334 F.3d 365 (3d Cir. 2003) (applying the no reliance standard).  Michael C. Joyce, Setting a Standard to Rely on: ERISA Benefit Claims Where the Summary Plan Description and Plan Document Conflict , 90 Iowa L. Rev. 765 (January 2005).  The Eighth Circuit falls somewhere between these two extremes.  The Court is of the opinion that the decision reached in this case reflects the reasoning found in the Eighth Circuit precedent on this issue and is consistent with ERISA's objective.

beneficiaries were "likely prejudiced" by the misinformation).  Accordingly, the Class Plaintiffs

established that they were prejudiced by the faulty SPD, and are entitled to the benefits that were

promised in the SPD.


## IV.  CONCLUSIONS OF LAW

1.      The words "change of control" as used in the faulty SPD are not ambiguous.

2.      The formal plan document and faulty SPD conflict in regards to the definition of "change of

control," and the words of the SPD control the terms of the ERISA plan.

3.      Class Plaintiffs were prejudiced by the misinformation found in the faulty SPD

## V.  DAMAGES

Class Plaintiffs request all the weeks of severance pay promised in the Change of Control Plan

with no set-off; prejudgment interest; attorneys fees; and costs.  Under ERISA, a successful plaintiff is

entitled to "recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B).

The primary purpose of ERISA is the protection of individual benefit rights.  *Harley v. Minnesota*

*Mining & Mfr.*, 284 F.3d 901, 907 (8th Cir. 2002).  Federal courts are to develop a "'federal

common law of rights and obligations under ERISA-regulated plans.'"  *Firestone Tire & Rubber Co.*,

489 U.S. at 110 (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 US. 41, 56 (1987)).  "Actions

challenging an employer's denial of benefits before the enactment of ERISA were governed by

principles of contract law," and accordingly, it follows that contract theories of recovery should govern

the award of benefits in this case.  *Id.,* 489 U.S. at 112.

"Contract damages are ordinarily based on the injured party's expectation interest and are

intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts, § 347 cmt. a.  (1981).  In the present case, the Class Plaintiffs expected the number of weeks of severance pay that was stated in the SPD, but they did not receive the number of weeks of pay that was promised.  *See* Golke Dep. 15:16-21 ("That's why when I went to the meeting with Kendra Sones after they announced the merger and she told me that I was getting three months, the first thing out of my mouth was 'what happened to the six months?  I thought it was six months.'").  Accordingly, in order to put the Class Plaintiffs "in as good a position as [they] would have been had [Defendant] fully performed," the Class Plaintiffs are due the difference between the amount they would have received under the ERISA plan, less the weeks of severance pay that they did receive.  Any additional amount would result in a windfall to the Plaintiffs, and "[e]xtra contractual damages may not be recovered under 29 U.S.C. § 1132."  *Medina v. Anthem Life Ins. Co.*, 983 F.2d 29 (5th Cir. 1993), *cert denied*, 510 U.S. 816 (1993).  Defendant, however, is not entitled to a credit for amounts they paid out under the Cooperation Bonus or the twenty-plus years of service Bonus.  Those bonuses were based on a different set of criteria and are independent from the weeks of severance that was paid to the Plaintiffs.  Plaintiffs are entitled to benefits, therefore, if the amount of Separation Pay they did receive was less than the amount promised under the ERISA plan.  *See* Ex. W.

The total amount of benefits due to the Class Plaintiffs is $1,661,317.62.  *See* Court's Ex. A. This amount was calculated using Exhibits 5, 5A, 5B, and W, and represents the amount of severance payments Plaintiffs were promised under the ERISA Plan less the separation payment they did receive.

The Class Plaintiffs who were promoted to buyer positions after October 27, 2000 (*See* Ex. 5B), are not entitled to recover benefits because there was no direct evidence presented at trial that these plaintiffs actually received and understood the October 27, 2000 letter.  Accordingly, with respect to those Plaintiffs, reliance or prejudice was not established.  Additionally, the amount awarded to Terry Montgomery is reduced based on his testimony that the figure stated on Exhibit 5 was incorrect.  Further, Mark Barkley is excluded from the Class, as he testified that he knew of the specialized meaning of "change of control" based on outside documents provided by Saks Inc., and accordingly could not have relied on the October 27, 2000 letter.

The Class Plaintiffs also request prejudgment interest.  "Prejudgment interest awards are permitted under ERISA where necessary to afford the plaintiff other appropriate equitable relief" under section 1132(a)(3)(B)."  *Christianson v. Poly-America, Inc. Med. Benefit Plan*, 412 F.3d 935, 941 (8th Cir. 2005) (quoting *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir. 1999)).  "'A common thread throughout the prejudgment interest cases is unjust enrichment– the wrongdoer should not be allowed to use the withheld benefits or retain interest earned on the funds during the time of the dispute.'" *Christianson*, 412 F.3d at 941 (quoting *Kerr,* 184 F.3d at 946).  In the present case, it is clear that Defendant retained the use of the benefit award during the dispute.  Accordingly, the purpose of prejudgment interest is served by awarding it to the Class Plaintiffs in this case and is to be calculated beginning on January 30, 2003 under the guidelines set forth in 28 U.S.C. § 1961.  *See Sheehan v. Guardian Life Ins. Co.*, 372 F.3d 962, 968 (8th Cir. 2004).

Class Plaintiffs also request an award of attorney fees.  "ERISA's fee shifting provision unambiguously gives the district court discretion to award attorney fees to 'either party.'" *Martin v.*

*Arkansas Blue Cross and Blue Shield,* 299 F.3d 966 (8th Cir. 2002); *see* 29 U.S.C. § 1132(g).

There is, however, no presumption that attorney fees must be awarded.  Instead, it is within the

discretion of a district court to determine when a fee is appropriate.  There are five factors set out in

*Lawrence v. Westerhaus*, 749 F.2d 494 (8th Cir. 1984) that district courts should use together with

"other relevant considerations" to determine when a fee is appropriate.  The five *Westerhaus* factors

are as follows: 1) degree of culpability or bad faith of the opposing party; 2) the ability of the opposing

party to pay attorney fees; 3) whether an award of attorney fees against the opposing party might have

a future deterrent effect under similar circumstances; 4) whether the parties requesting attorney fees

sought to benefit all participants and beneficiaries of a plan or to resolve a significant legal question

regarding ERISA itself; and 5) the relative merits of the parties' positions.  *Id.* at 495.  There is not

enough information before the Court to make its determination as to whether an additional award of

attorney fees is appropriate in this case.  Accordingly, the parties are ordered to file an additional brief

on the issue of attorney fees and costs, including argument as to whether fees are appropriate and the

amount of attorney fees and costs that are requested.  *See* Fed. R. Civ. P. 54(d); Local Rule 54.2(a).

VI.  ORDER

For the reasons stated herein, Class Plaintiffs are entitled to ERISA benefits pursuant to 29

U.S.C. § 1132(a)(1)(B) in the amount of $1,661,317.62.  Prejudgment interest from the date of

Plaintiffs' terminations, January 30, 2003, is appropriate in this case and is to be calculated according

to 28 U.S.C. § 1961.  The parties are ordered to file, no later than October 14, 2005, additional briefs

in regards to the request for attorneys' fees and costs.  At that time the Court will file an order on those

issues.

IT IS SO ORDERED.

Dated this ___23rd___ September, 2005

_Robert W. Pratt_
ROBERT W. PRATT
U.S. DISTRICT JUDGE

COURT'S EXHIBIT A

| Name of Plaintiff | Separation Payment Received | Amount Plaintiff Would Have Received Under the Change of Control Plan | Difference |
|---|---|---|---|
| Sara Biris | $5,308 | $23,000.04 | $17,692.04 |
| Thomas Pavsek | 150,600 | 301,200.12 | 150,600.12 |
| Ken Shuler | 165,000 | 330,000.12 | 165,000.12 |
| Alan Edward Miller | 197,250 | 394,499.88 | 197,249.88 |
| Nancy Altman | 132,975 | 265,950 | 132,975 |
| Terry Montgomery | 117,225 | 156,800 | 39,575 |
| David Rothrock | 60,231 | 108,000 | 47,769 |
| Donna Noel | 52,981 | 94,999.92 | 42,018.92 |
| Kristin Poncius | 58,614 | 105,100.08 | 46,486.08 |
| Gerald Lamar Anderson | 69,154 | 124,000.08 | 54,846.08 |
| Mark D. Leslie | 75,734 | 135,798.96 | 60,064.96 |
| Daniette K. Holliday | 46,010 | 82,500 | 36,490 |
| Kristin Winterbottom | 71,943 | 129,001.20 | 57,058.20 |

| | | | |
|---|---|---|---|
| Michele Barber f/k/a Michele Antolik | 42,608 | 76,399.92 | 33,791.92 |
| Douglass Duke | 60,900 | 109,200 | 48,300 |
| Douglass Hansen | 42,663 | 76,500 | 33,837 |
| Suzanne Hoube McLellan | 15,808 | 34,250.04 | 18,442.04 |
| Kristen Gray | 13,846 | 30,000 | 16,154 |
| Sarah Darlene Bailey | 10,269 | 22,250.04 | 11,981.04 |
| Justine Dalbey | 12,669 | 27,450 | 14,781 |
| Marleen Ann Dixon | 14,123 | 30,600 | 16,477 |
| Michelle L. Fitzgerald | 11,815 | 25,599.96 | 13,784.96 |
| Anne Golke | 14,654 | 31,749.48 | 17,095.48 |
| Carol A. Jones | 11,308 | 24,500.04 | 13,192.04 |
| Jennifer Jo Ladehoff | 9,646 | 20,900.04 | 11,254.04 |
| Kristi Moody | 10,662 | 23,100 | 12,438 |
| David Otte | 12,415 | 26,899.56 | 14,484.56 |
| Linh Phanthavong | 10,038 | 21,750 | 11,712 |
| Blake Pinneke | 12,231 | 26,499.96 | 14,268.96 |
| Susan Robeoltman | 10,038.46 | 21,750 | 11,711.54 |
| Samuel Shaver Jr. | 15,738 | 34,100.04 | 18,362.04 |
| Brook R. Stade | 10,962 | 23,750.04 | 12,788.04 |
| Dena Steinback | 10,085 | 21,849.96 | 11,764.96 |
| Emily Toth | 18,854 | 40,850.04 | 21,996.04 |
| Julie Vogeler | 13,638 | 29,550 | 15,912 |
| Connie Ward | 13,385 | 29,000.04 | 15,615.04 |

| | | | |
|---|---|---|---|
| Tosha Whitson | 9,923 | 21,500.04 | 11,577.04 |
| Scott Winterbottom | 18,308 | 33,999.96 | 15,691.96 |
| Cheryl Womack | 11,308 | 24,500.04 | 13,192.04 |
| Darlene Owens | 11,308 | 24,500.04 | 13,192.04 |
| Gina Dellavedova Piper | 13,085 | 28,350 | 15,265 |
| Michele Winger | 17,769 | 38,499.96 | 20,730.96 |
| Anne Owen | 60,789 | 109,000.08 | 48,211.08 |
| Jack Wahr | 61,442 | 106,600 | 45,158 |
| Cynthia Glynn | 29,250 | 29,250 | 0 |
| John Harrison | 46,846 | 40,599.96 | n/a |
| Anne Krueger | 17,752 | 27,150 | 9,398 |
| Frances Cowan | 25,231 | 32,799.96 | 7,568.96 |
| Kay Thompson | 25,786 | 29,149.56 | 3,363.56 |
| Ellen Tuinstra | 35,804 | 32,100 | n/a |
| Connie Boesen | 39,763 | 35,649.48 | n/a |
| TOTAL | | | **$1,661,317.62** |